MAKAR, J.,
concurring in affirmance.
Marlena Woods, a homeless mom with four children, pled guilty to shoplifting food for her family from a Jacksonville Walmart. Due to prior petit theft convictions, she scored 8.3 points on her sentencing scoresheet, which meant a presumptive nonstate sentence not exceeding twelve months in the Duval County jail under section 775.082(10), Florida Statutes (2009), a statute not mentioned at her plea colloquy. Under that statute, the State argued that she should be sent to state prison because sentencing her to county jail (or some other nonstate sanction) would present a “danger to the public” that state incarceration would prevent. Based on his factual findings of Woods’s alleged dangerousness to the public, the trial judge imposed an eighteen-month term of state imprisonment. At issue is whether section 775.082(10) is unconstitutional because it authorized a sentence above the statutory maximum (twelve months in county jail) based on factual findings made by the trial judge, rather than a jury, in violation of Woods’s right to jury trial in the federal constitution. See U.S. Const. amend. VI; Blakely v. Washington, 542 U.S. 296, 304, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004); Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). A panel opinion avoided the constitutional question by construing section 775.082(10) to require the jury, post-verdict, to make factual findings the statute says a judge must make, Woods v. State, 41 Fla. L. Weekly D1676, — So.3d —, 2016 WL 3911076 (Fla. 1st DCA July 20, 2016), bu*3C**t a 10-4 vote resulted in en banc consideration of the case. Though Woods served her eighteen-month sentence after en banc review was granted (but before argument was ordered), the issue presented is one of ongo *805 ing and exceptional importance for judicial resolution.[1]
1—Í
A. APPRENDI/BLAKELY
In 2009, the Florida Legislature enacted a requirement that trial judges sentence non-violent, low-scoring (under twenty-two points) offenders to nonstate[2] prison sanctions unless the judge determines via written findings that a nonstate prison sanction might “present a danger to the public,” allowing him to exercise his discretion to impose a greater sanction. See Ch. 2009-63, § 1, Laws of Fla. (creating subsection 10 to section 775.082, Florida Statutes, which gives trial judges this discretion); Fla. S. Comm, on Crim.. & Civil Just. Approp., CS for SB 1722 (2009) Staff Analysis 2-3, 7 (April 6, 2009), http://archive.flsenate.gov/data/session/ 2009/Senate/bills/analysis/pdf/2009sl722. wpsc.pdf [hereinafter Crim. and Civ. Just. Comm. SB 1722 Staff Analysis] (summarizing the subsection as “[c]reating a prison diversion approach by requiring the court to sentence certain non-violent low-scoring offenders to a nonstate prison sanction unless the court finds that such a sentence could endanger the public”). Due to budgetary reductions to Florida’s Department of Corrections, the legislative intent was to reduce state expenses via the curtailment of the past practice of sentencing non-violent, low-scoring offenders to state prison, which was prevalent at the time. The newly-added subsection, consisting of two sentences, stated in full:
(10) If a defendant is sentenced for an offense committed on or after July 1, 2009, which is a third degree felony but not a forcible felony as defined in s. 776.08, and excluding any third degree felony violation under chapter 810, and if the total sentence points pursuant to s. 921.0024 are 22 points or fewer, the court must sentence the offender to a nonstate prison sanction. However, if the court makes written findings that a nonstate prison sanction could present a danger to the public, the court may sentence the offender to a state correctional facility pursuant to this section.
§ 775.082(10), Fla. Stat. (emphasis added). Highlighted is the last sentence, which is the primary portion at issue in this case. The text of subsection (10) has not changed since its enactment.
The statutory authority in the last sentence of subsection (10), allowing a trial judge to make factual findings to increase an offender’s sentence to a state correctional facility, is unconstitutional because *806 only a jury may make findings that increase: a penalty beyond a statutory maximum (which is up to twelve months of incarceration as a nonstate sanction).[3] See *807 Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (“Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.”); see also Blakely, 542 U.S. at 304, 124 S.Ct. 2531 (“When a judge inflicts punishment that the jury’s verdict alone does not allow, the jury has not found all the facts ‘which the law makes essential to the punishment,’ ... and the judge exceeds his proper authority.”) (citation omitted). Our supreme court has held similarly in the context of upward departures. Plott v. State, 148 So.3d 90, 95 (Fla. 2014) (“[W]e hold that upward departure sentences that are unconstitutionally enhanced in violation of Apprendi and Blakely patently fail to comport with constitutional limitations, and consequently, the sentences are illegal under rule 3.800(a).”).
The trial court’s actions violated Woods’s-right to a jury under the Sixth Amendment as explained in Apprendi and its federal and Florida progeny, but Woods has raised only a facial constitutional challenge on appeal. Delaney v. Tucker, 88 So.3d 1036, 1037 (Fla. 1st DCA2012) (stating that a “direct appeal is the proper avenue for a facial constitutional, challenge to a criminal statute”).[4] A “facial challenge to a statute is more difficult than an ‘as applied’ challenge, because the challenger must establish that no set of circumstances exists under which the statute would be valid. ... such a challenge must fail unless no set of circumstances exists in which the statute can be constitutionally applied.” Cashatt v. State,, 873 So.2d 430, 434 (Fla. 1st DCA 2004).
One possible constitutional “application” of subsection (10) is that a defendant may *808 waive his constitutional rights under Ap-prendi and Blakely by allowing a trial judge to make factual findings, rather than a jury. But in doing so, a defendant effectively waives the substantive constitutional right that subsection (10) fails to facially protect; if a statute is deemed constitutionally “applied” simply because a defendant waives his constitutional rights in the application of the challenged portion, then every statute has this potential “application,” making no facial adjudication ever possible. The same is true of a defendant who—for inexplicable reasons—agrees to a factual finding that he could pose a “danger to the public” thereby allowing the trial judge to impose a nonstate sanction; this type of constitutional “application” is not only fanciful but also an avoidance, rather than an application, of the challenged statutory language at issue.
Similarly, another possible constitutional “application” of subsection (10) is to construe it in a way that avoids a constitutional violation. Under this approach (which the panel used), the statutory language requiring a trial court to make written factual findings would be interpreted to require a jury to make such findings instead. But this requires rewriting subsection (10) to say:
However, if the court jury makes written findings that a nonstate prison sanction could present a danger to the public, the court may sentence the offender to a state correctional facility pursuant to this section.
Doing so judicially engrafts a requirement into the statute that a jury makes the factual findings that the statute says the court must make (in writing no less). Judicially rewriting a statute’s offensive parts is not an “application” for purposes of a facial challenge.
Finally, another possible constitutional “application” is where a trial judge relies solely upon a defendant’s past convictions to increase punishment to a state sanction. This application refers to the language of Apprendi that excluded from its holding “the fact of a prior conviction,” which trial judges had used for sentencing purposes where a prior conviction was a statutory feature of a crime. See, e.g., Almendarez-Torres v. United States, 523 U.S. 224, 227, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998) (upholding a statute with a penalty provision allowing a “sentencing judge to impose a higher sentence when the unlawfully returning alien also has a record of prior convictions”). Excepting out prior convictions was deemed permissible because “unlike virtually any other consideration used to enlarge the possible penalty for an offense ... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees.” Jones v. United States, 526 U.S. 227, 249, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999).
But nothing in subsection (10) empowers a trial judge to rely solely on an offender’s prior convictions as the factual basis for its “written findings that a nonstate prison sanction could present a danger to the public” as the statute requires. The last sentence of subsection (10) is not a violent career criminal statute, a habitual offender statute, or the like that excepts it from Apprendi-, instead, it establishes a future dangerousness test based on additional fact-finding by a judge. Adjudicating whether an offender “could present a danger to the public” absent a nonstate sanction involves a multitude of factors, only one of which is whether the offender has a criminal record for which a prior conviction is but a data point.[5] Reed, 192 So.3d *809 at 646 (providing a non-exhaustive list of factors including criminal history, victim injury, and propensity for one to commit future crimes). Faced with substantial enhancement of his sentence, no defendant (through effective counsel) would limit the evidentiary review required under subsection (10) to only his prior convictions without presenting other evidence in mitigation. It is one thing to enlarge a penalty where Congress or the State of Florida has made a prior conviction a central feature of a crime; it is another to allow a trial judge to engage in wide-ranging fact-finding—constitutionally entrusted to a jury—about an offender’s potential for being a “danger to the public” to support an enhanced penalty. And it is yet another to allow prior convictions, which already underlie the arithmetic determination of points for sentencing scoresheet purposes in Florida, to be used duplieatively to increase a sentence without jury involvement. Id. at 647 (stating that “a sentencing court’s finding of an offender’s danger to the public must be more than the recitation of acts that are inherent to the crimes for which the defendant was convicted”). To do so would subject every offender to a state prison sentence, which conflicts with the intent of subsection (10) to enhance sentences of truly violent offenders. Id. at 648. If the Florida Legislature had deemed that the mere existence of a prior conviction was enough to increase punishment for this class of mostly non-violent offenders, it could have done so. See Almendarez-Torres, 523 U.S. at 227, 118 S.Ct. 1219. Instead, it established a pliable “danger to public” standard for which the narrow exception of Apprendi was not intended. See Apprendi, 530 U.S. at 490, 120 S.Ct. 2348 (“[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.”).
Given that no sensible constitutional application of subsection (10) exists, a facial challenge is appropriate. As the United States Supreme Court has noted, the “distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.” Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). A court must weigh the alternatives offered when deciding whether an exercise of judicial authority is appropriate. As the Supreme Court explained:
It is not judicial restraint to accept an unsound, narrow argument just so the Court can avoid another argument with broader implications. Indeed, a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling.
Id. at 329. Where there exists “the lack of a valid basis for an alternative ruling,” a court’s “full consideration of the continuing effect” of a constitutionally-challenged practice may be pursued. Such is the case here, where no readily apparent constitutional applications of subsection (10) exist.
B. SEVERANCE
Because the last sentence of subsection (10) is unconstitutional, the question of severance arises: should all of subsection (10) be stricken or only its last sentence? If only the last sentence is stricken, sentencing of all offenders would be limited to *810 nonstate sanctions; if all of subsection (10) is stricken, reversion to the prior version of the sentencing statute would result, allowing trial judges to impose any term of imprisonment up to five years for the class of offenders to which subsection (10) applied. See § 775.082, Fla. Stat. (2008); see also Crim. & Civ. Just, Comm. SB 1722 Staff Analysis (discussing the then-current sentencing options).
The well-established test for severance was set out in Cramp v. Board of Public Instruction of Orange County, 137 So.2d 828, 830 (Fla. 1962):
The rule is well established that the unconstitutionality of a portion of a statute will not necessarily condemn the entire act. When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.
Our supreme court has said the “Cramp test is a well established component of Florida law. It has been applied repeatedly in countless Florida cases.” Schmitt v. State, 590 So.2d 404, 415 (Fla. 1991).
In this cáse, factors (1), (2), and (4) are met, the only question remaining is whether “the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other[.]” Cramp, 137 So.2d at 830. The most reasonable conclusion is that the Legislature passed subsection (10) as a unified, inseparable whole and would not have wanted severance of its component parts. Subsection (10) reflects a compromise between two related goals: the fiscal goal of reducing state prison expenses 'and the public safety goal of ensuring that violent offenders be subject to state prison sentences if nonstate sanctions don’t suffice. Striking only the last' sentence, which would result in nonstate sentences for all offenders no matter their dangerousness, serves the former goal at the expense of the latter. No indication exists that the Legislature would have down-graded sentences within this classification (from up to five years to nonstate sentences) without the concurrent potential for violent offenders to be placed in the state prison system. Stated differently, it cannot be said that the Legislature would have passed only the first sentence in subsection (10) but not the last; the two are intertwined. Thus, striking the entirety of subsection (10) is required because the last sentence cannot be severed without undermining legislative prerogatives.
C. HARMLESS ERROR
Buttressing this conclusion is application of the harmless error doctrine, which the United States Supreme Court and our supreme court have held applies to Appren-di/Blakely errors. Neder v. United States, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (noting that the “omission of an element is an error that is subject to harmless-error analysis”); Plott, 148 So.3d at 95 (“A claim of error under Apprendi and Blakely is subject to a harmless error analysis.”); Galindez v. State, 955 So.2d 517, 524 (Fla. 2007) (“IW]e hold that harmless error analysis applies to Apprendi and Blakely error.”); see also Hurst v. Florida, — U.S. —, 136 S.Ct. 616, 624, 193 L.Ed.2d 504 (2016) (noting that the Supreme Court “normally leaves it to state *811 courts to consider whether an error is harmless”); Washington v. Recuenco, 548 U.S. 212, 222, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (“Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error.”).
In Neder v. United States, the Supreme Court stated the harmless-error inquiry as follows: “Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?” 527 U.S. at 18, 119 S.Ct. 1827. Our supreme court adopted this harmless error test. See Galindez, 955 So.2d at 522 (adopting Neder, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35). The Supreme Court elaborated:
A reviewing court making this harmless-error inquiry does not, as Justice Tray-nor put it, “become in effect a second jury to determine whether the defendant is guilty.” ... Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that- could rationally lead to a contrary finding with respect to the omitted element.
Neder, 527 U.S. at 19, 119 S.Ct. 1827. The Neder standard focuses on the omission of an element of a crime, which is not the case here, but our supreme court has extended the analysis to sentencing as well. Galindez, 955 So.2d at 523 (“[F]or purposes of our harmless error analysis the issue is whether the failure to have the jury make the victim injury finding as to Count I contributed to the conviction or sentence”) (emphasis added).
Under this approach, we make believe that a hypothetical jury is presented with the ■ dangerousness question and ask whether there is any evidence in the record “that could rationally lead” a jury to conclude that Woods did not present a danger to the public, if subject to only a nonstate sanction? On this point, the panel concluded that “no rational jury would have declined to find that [Woods] posed a financial danger to the public” based on her theft/burglary convictions, which is pure speculation; she scored only 8.3 points and could be viewed sympathetically by jurors because at the time of the offense she was a homeless mom living in the woods with her kids for whom she had stolen food (she was living with an aunt at the time of sentencing). And because the clear import of the 2009 amendment was to ensure that only violent offenders be subject to state prison, it is not at all cléar that a jury would necessarily find that the “financial danger” posed by Woods was the type of “danger to the public” unless subject to a state sanction that the Legislature meant to punish more severely. But see McCloud v. State, 55 So.3d 643, 645 (Fla. 5th DCA 2011) (concluding that harm from writing bad checks falls within the meaning of “danger to the public”). What’s more, even if a hypothetical jury found that Woods' “posed a financial danger to the public,” the trial judge statutorily would still have to exercise his or her discretion in deciding whether to impose a prison sanction. See § 775.082(10), Fla. Stat. How that judicial discretion might be exercised in this particular case is equally speculative. For these reasons, the constitutional error cannot be deemed harmless because a jury could rationally conclude that Woods did not present a danger to the public under the circumstances.
As such, the most reasonable remedy is to revert to the prior sentencing statute. Because this case is a direct appeal, not a post-conviction case,[6] Woods—had she not *812 already served her eighteen-month sentence—would be resentenced on remand under the former statutory framework, which allowed a sentence of up to five years in state prison. The conundrum is that every sentence previously imposed under subsection (10) would necessarily be within the maximum of five years, raising the question of whether re-sentencing would be a useless exercise. It is conceivable that Woods could have been resen-tenced on remand to the same sentence. If so, the Apprendi/Blakely error could be deemed harmless as to her because it did not contribute to her sentence, one she could have been sentenced to under the prior sentencing statute. For this reason, although she prevails on the merits of her constitutional claim, no remedy is available for her. Prospectively, however, the invalidation of subsection (10) would operate to preclude trial courts from undertaking fact-finding as to an offender’s potential for danger to the public if subject to a nonstate sanction.
CONCLUSION
Subsection 775.082(10) is unconstitutional under Apprendi and Blakely, and the appropriate remedy is to allow for resen-tencing under the prior version of the sentencing statute. By doing so, deference and respect is given to the Legislature and the language of its enactment, allowing trial judges to exercise their discretion by re-sentencing this class of offenders as they would have absent the unconstitutional process added in 2009. Prospectively, trial judges can still impose sentences in the lower ranges where the record reflects that a defendant has a non-violent past and is low-scoring; if a defendant has indicia of violence and poses a true danger to the public, a sentence in the upper range could be imposed. As to Woods, no remedy is available since she’s already served her time; her sentence, though arrived at via an unconstitutional procedure, fell within the lawful range under the prior sentencing code.
ROBERTS, C.J., LEWIS and BILBREY, JJ., join; WETHERELL, J., joins except as to Part C.

. See Godwin v. State, 593 So.2d 211, 212 (Fla. 1992) ("[It] is well settled that mootness does not destroy an appellate court’s jurisdiction ... when the questions raised are of great public importance or are likely to recur.”) (quoting Holly v. Auld, 450 So.2d 217, 218 n.1 (Fla. 1984)); see also Casper v. State, 187 So.3d 255, 257 (Fla. 1st DCA 2016) (“Our court, though being presented with the issue, has avoided writing an opinion on it.”) (Makar, J., concurring); Murphy v. State, 161 So.3d 1282, 1284 (Fla. 1st DCA. 2015) ("[W]e do not reach appellant's alternate claim that section 775.082(10) is unconstitutional under Apprendi and its progeny because the statute deprived him of his Sixth Amendment right to a jury determination of any fact which enhances his sentence.”) (internal citations omitted); Jones v. State, 71 So.3d 173, 179 (Fla. 1st DCA 2011) (B.L. Thomas, J., concurring in result only) ("We should hold that a trial court lacks the lawful authority under this statute to make any findings without a special jury verdict or a waiver of the defendant’s Sixth Amendment right.”).

. Reed v. State, 192 So.3d 641, 645 (Fla. 2d DCA 2016) (“Although section 775.082(10) does not define ‘nonstate prison sanction,’ the phrase is ‘understood to mean probation, community control, or imprisonment in the county jail for up to one year.' ”) (citing Jones, 71 So.3d at 175).

. Neither party advances the view that Ap-prendi is inapplicable simply because Woods’s eighteen-month state prison sentence is less than five years, which is the maximum duration for both nonstate and state sentences under subsection (10), the reason being that a five-year state sanction (i.e., five years in prison) is substantially different from—and far more punitive than—any possible five-year nonstate sanction (i.e., up to twelve months in county jail plus four years of probation/community control or five years of the latter); durational equivalence means nothing due to the punitive asymmetry between these two dissimilar punishments. As far back as Jones v. State, the State had the opportunity to respond to a focus order raising this specific issue, which comparatively cited State v. Carr, 274 Kan. 442, 53 P.3d 843, 850 (2002) (‘‘Ap-prendi applies only to upward durational departures of a sentence” and is inapplicable to "a sentencing judge’s decision to impose a dispositional departure prison sentence rather than to grant probation.”) and State v. Allen, 706 N.W.2d 40, 47 (Minn. 2005) (finding statute authorizing trial court to make an "upward dispositional departure upon finding an aggravating factor without the aid of a jury” is "unconstitutional as applied”). The State did not embrace this distinction in Jones and does not do so in this case; indeed, it conceded that the last sentence of subsection (10) violated Apprendi on the facts of that case, which are similar to this case (see next footnote).
Focusing solely on a durational maximum of five years, without distinguishing between the types of punishment imposed, overlooks two related points that demonstrate why Ap-prendi applies in this case. First, probation and community control are not incarcerative sentences; instead, they are alternative non-incarcerative forms of penance. See § 948.001(9), Fla. Stat. (2016) (" 'Probation' means a form of community supervision requiring specified contacts with parole and probation officers and other terms and conditions as provided” by statute.); § 948.10, Fla. Stat. (2014) (Community control is "an alternative, community-based method to punish an offender in lieu of incarceration.”); see also Carr, 53 P.3d at 850 ("A person on probation or parole is not serving a sentence.”), A judge deciding whether to impose probation or incarceration does not alter the range of incar-cerative punishment. Thus, cases like Carr and State v. Anderson, 867 N.W.2d 718, 724 (S.D. 2015), which involved only the judicial choice between probation and an incarcera-tive sentence, don’t apply here because the dispositional decision to place an offender on probation versus imposing a jail sentence within a specified incarcerative range (such as six months in jail rather than six months of probation) is different from imposing a harsher sentence beyond that specified range. The question in Carr and Anderson was a binary one; whether a guilty offender should be placed on probation or incarcerated—one traditionally allocated to the trial judge's discretion and not subject to Apprendi, much like consecutive sentencing for multiple offenses. Oregon v. Ice, 555 U.S. 160, 163, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009). Neither Carr nor Anderson involved the question here: whether a court may increase punishment beyond the statutory maximum based on additional fact-finding by a judge. In fact, Anderson specifically disclaimed that its decision applied to situations where the range of imprisonment could be increased, and Carr held that Apprendi applied to "upward dura-tional departures of a sentence,” as is the case here. See Anderson, 867 N.W.2d at 724 (the decision to deny or revoke probation and thereby incarcerate an offender "is within the court's purview to decide facts relevant to that decision. ... such a decision does not alter the range of years of imprisonment that a court may impose for a particular offense”) (emphasis added); Carr, 53 P.3d at 850.
Second, up to five years in the Florida prison system is qualitatively more severe than up to twelve months in the county jail plus four years of probation; the incarcera-tive component of the former is five times more punitive than the latter, making Appren-di applicable, as noted in Jones:
Thus, without a juiy finding, a trial court cannot impose a "dispositional departure,” i.e.,' incarceration rather than probation, because that would exceed the statutory maximum by increasing the quantum of punishment even though the length of the sentence might be no different. In other words, five years of probation is most certainly not equal to five years of state prison: the latter is' qualitatively, albeit not quantitatively, more severe. Accordingly, a "dispo- *807 sitional departure” is just as invalid for Sixth Amendment analysis as a “durational departure.”
Jones, 71 So.3d at 178 (B.L. Thomas, J., concurring in result). Here, Woods faced a maximum of up to one year in county jail, which increased to five years in state prison based solely on fact-finding by a judge, rather than a jury. In short, Apprendi doesn't apply when a trial judge exercises traditional sentencing discretion under the first sentence of subsection (10) by imposing a nonstate sanction; if Woods had been sentenced to time in the county jail rather than a probationary term (or some combination of the two), Apprendi would not be implicated. Apprendi does apply, however, when a trial judge engages in the next step—that being to engage in additional factual-finding under the last sentence of subsection (10)—thereby allowing him to increase an incarcerative sentence beyond the statutory nonstate maximum founded upon jury findings.

. On similar facts, the State conceded six years ago that the application of subsection (10) violates Apprendi/Blakely. See Jones, 71 So.3d at 178 (noting that "the State correctly conceded at oral argument that 'on these facts [as found by the trial judge],’ the prison sentence under section 775,082(10), Florida Statutes, violates the holding of Blakely—not because the judge’s findings are flawed, but because only a jury of Appellant’s peers can make such a finding”) (B.L. Thomas, L, concurring in result). Indeed, prior to oral argument in Jones, the State and the public defender jointly stipulated as follows: “The parties also agree that on the facts of this case, the trial court’s imposition of sentence of 3-years state prison based solely on a judicial determination under the last of section 775.082(10), Florida Statutes, that 'a non-state prison sanction could present a danger to the public’, violates the holdings of the U.S. Supreme Court in Apprendi ... and Blakely .... ” And at oral argument, the State opened with the following:
State: Although the State would like to contend that Blakely does not apply, on the facts of this case, the State cannot in good faith contend that it does not
[[Image here]]
Judge Swanson: So the Attorney General for the State of Florida is conceding that Apprendi applies in this instance?
State: On the facts of this case ...
Tr. of Oral Argument, 1D10-1568, at 15:36.

. A good example of how a "prior convictions” application might swallow the statute *809 is Porter v. State, 110 So.3d 962, 964 (Fla. 4th DCA 2013), case dismissed as moot, 137 So.3d 1021 (Fla. 2014), which involved judicial fact-finding and prognostications that exceeded the mere' fact that the defendant had prior convictions.

. On post-conviction review, it is probable that the Apprendi/Blakely error would be deemed either not retroactive or harmless in most, if not all, cases. See State v. Johnson, *812 122 So.3d 856, 865-66 (Fla. 2013) {Blakely does not apply retroactively, in part, because of the adverse effect on the administration of justice.); Mitchell v. State, 145 So.3d 890, 892 (Fla. 1st DCA 2014) (sentences within the statutory maximum "are not subject to collateral attack on the basis of Blakely or Appren-di").